STAPLES et al. v. ADAMS, PAYNE & GLEAVES, Inc.

In re T. W. KIRKBRIDE, Inc.

(Circuit Court of Appeals, Fourth Circuit. May 18, 1914.)

No. 1225.

1. MECHANICS' LIENS (§ 113*)—RIGHTS AS TO MONEY DUE CONTRACTOR—CONSTRUCTION OF STATUTE—"OWNER."

Code Va. 1904, § 2479, provides that a subcontractor may give notice in writing to the owner of his contract, stating the probable amount of his claim, and, on furnishing the owner, within 30 days after completion of the contract, with a correct copy of his account, the owner shall be personally liable for the same, provided it does not exceed the sum due from him to the general contractor when the notice is given or which thereafter becomes due under the contract. *Held* that, within the meaning of such statute, the "owner" is the person who contracts as such for the erection of the building, regardless of who owns title to the land; that where a railroad company contracted for the erection of a building on land of which it was in fact the owner, although the title was in a subsidiary company of which it owned all the stock, notice by a subcontractor was properly given to the railroad company.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 148; Dec. Dig. § 113.*

For other definitions, see Words and Phrases, vol. 6, pp. 5134–5151; vol. 8, p. 7744.]

2. MECHANICS' LIENS (§ 113*)—RIGHTS AS TO MONEY DUE CONTRACTOR.

Under such statute, as construed by the Supreme Court of Appeals of the state, a subcontractor cannot avail himself of its benefit unless he serves his notice prior to or during performance of his contract and before its completion.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 148; Dec. Dig. § 113.*]

3. MECHANICS' LIENS (§ 113*)—"SUBCONTRACTOR."

One who furnished materials to a contractor for the construction of a building is not a "subcontractor" and entitled to the benefits of a mechanic's lien statute as such, unless the same were furnished under a continuing contract and not purchased separately on orders as needed.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 148; Dec. Dig. § 113.*

For other definitions, see Words and Phrases, vol. 7, pp. 6704, 6705; vol. 8, p. 7806.]

4. MECHANICS' LIENS (§ 113*)—RIGHT TO BENEFIT OF STATUTE—CONTRACT.

A subcontract to furnish materials for a building terminated on the making of a general assignment by the contractor, and materials subsequently furnished to the owner, who completed the building, are not chargeable thereunder for the purpose of extending the time for filing a lien.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 148; Dec. Dig. § 113.*]

Appeal from the District Court of the United States for the Western District of Virginia, at Roanoke; Henry Clay McDowell, Judge.

In the matter of T. W. Kirkbride, Incorporated, bankrupt. From an order adjudging a fund in court to Adams, Payne & Gleaves, Incorporated, A. P. Staples, Jr., trustee, and W. A. Bodell and others, mechanic's lien creditors, appeal. Reversed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

A. C. Hopwood and A. B. Hunt, both of Roanoke, Va. (L. J. Holland, of Bluefield, W. Va., and Poindexter & Hopwood, of Roanoke, Va., on the brief), for appellants.

M. M. Caldwell and H. T. Hall, both of Roanoke, Va. (C. S. McNulty, of Roanoke, Va., on the brief), for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

KNAPP, Circuit Judge. In the latter part of April, 1910, the Norfolk & Western Railway Company entered into a written contract with T. W. Kirkbride, Incorporated, a Virginia corporation, whose home office was in Roanoke, for the construction of a railroad Y. M. C. A. building at Crewe, Nottoway county, Va. The contract price agreed upon was $25,670.

As may here be stated, the title to the land on which this building was erected was held by the Virginia Company, which is a Virginia corporation organized by the Norfolk & Western Railway Company for the purpose of taking title to such lands as it might desire to purchase without subjecting them to the lien of the general mortgages covering its railroad property. Of the 1,000 shares of stock of the Virginia Company, 993 were owned by the railway company; the other seven shares being issued to its directors, all of whom were officers or directors of the railway company. The officers and directors of both companies were the same. The railway company furnished the funds with which the land at Crewe was bought, and the Virginia Company not only claims no interest in this land, except as the holder for convenience of the legal title, but avers that the railway company is the beneficial owner thereof and entitled to a conveyance of the same whenever requested.

For use in the construction of the building in question, the contractor, T. W. Kirkbride, Incorporated, purchased some thousands of dollars worth of materials from the appellee, Adams, Payne & Gleaves, Incorporated, which is also a Virginia corporation carrying on business at Roanoke. From the account of sales as printed in the record, upon which some further comment will be made later in this opinion, it appears that the materials furnished by this concern between May 6, 1910, and November 7, 1910, amounted in the aggregate to $6,106.66, of which $1,345.20 had been paid in cash and freight charges prior to the last-mentioned date.

Not long afterwards, T. W. Kirkbride, Incorporated, became financially embarrassed, and on December 30, 1910, made a general assignment for the benefit of its creditors; the deed of assignment being recorded on the following day in the clerk's office of the corporation court for the city of Roanoke. At that time the Y. M. C. A. building at Crewe was about 90 per cent. finished. The assignee continued the work to some extent until January 12, 1911, when he abandoned it altogether, for reasons which do not appear. The railway company thereupon took possession and completed the building, as it had a right to do under the terms of its contract. For this purpose the railway company procured materials from appellee to the amount of $367.31, but appellee charged the same to the contractor, in continuation of the previous account, and declined to accept pay therefor from

the railway company. Prior to the assignment the railway company had paid on account of the contract price the sum of $21,324.08, including freight charges of $595.56, and the amount expended in completing the contract, between January 12th and February 15, 1911, was $1,007.46, leaving an admitted balance of $3,338.46, which is the subject of this litigation.

In the meantime, on January 4, 1911, Adams, Payne & Gleaves, Incorporated, served notice on the railway company, under section 2479 of the Code of Virginia, to the effect that it was furnishing materials to the contractor, T. W. Kirkbride, Incorporated, for the erection of said building, and that the probable amount of its claim would be $7,-000, and asked the railway company to retain a sufficient amount to pay its demand from the moneys remaining due on the contract. This notice was served on the railway company but not on the Virginia Company. About this time a number of mechanics' liens were filed by various creditors in the circuit court of Nottoway county against the Virginia Company, the Norfolk & Western Railway Company, and T. W. Kirkbride, Incorporated, for materials furnished and work done in the construction of said building, and in March following suits were brought in that court for the purpose of enforcing such liens.

On February 15, 1911, which was within 30 days after the completion of said building, Adams, Payne & Gleaves, Incorporated, served an itemized and verified statement of their claim on the treasurer of the railway company, and also, three days later, on the secretary and treasurer of T. W. Kirkbride, Incorporated, but no service was made or attempted to be made on the Virginia Company. Thereafter, at the first April rules, 1911, of the corporation court, Adams, Payne & Gleaves, Incorporated, filed suit against the railway company, based upon the notice served as above stated, to recover the sum of $5,182.-77, with interest from January 28, 1911, which was the unpaid balance for materials it had furnished for the construction of the building in question. This balance included the $367.31 for items furnished after the assignment of the contractor.

Thereupon, on May 12, 1911, and before the suit just referred to came to trial, the railway company filed a bill in the same court, in the nature of an interpleader, setting up the facts relating to its contract with T. W. Kirkbride, Incorporated, and also the fact that suits had been brought to enforce the mechanics' liens mentioned, alleging that it had said balance of $3,338.46 in its hands, that there were various claimants to this fund, that it desired to pay the same in such manner as to protect itself in the premises, and asking that Adams, Payne & Gleaves, Incorporated, be enjoined from prosecuting its suit at law, and that the court take charge of the fund and determine the rights of the parties making claim thereto.

On May 16, 1911, on the petition of certain of its creditors, T. W. Kirkbride, Incorporated, was adjudicated an involuntary bankrupt. The trustee in bankruptcy soon after his appointment filed a petition in the equity suit which the railway company had brought as above recited, asking that the fund in question, which was alleged to belong to the bankrupt's estate, be turned over to him as such trustee, on the ground that the District Court for the Western District of Virginia

had prior jurisdiction to determine the rights and priorities of the contending creditors. Adams, Payne & Gleaves, Incorporated, filed an answer to this petition, and the corporation court, by decree entered April 20, 1912, stayed and enjoined all further proceedings in that suit until the issues involved were determined in the bankruptcy court.

In compliance with an order later entered in the bankruptcy proceeding, the railway company turned over to the trustee the aforesaid balance due upon its contract with the Kirkbride Company. No appeal was taken by Adams, Payne & Gleaves, Incorporated, from the decree of the corporation court of April 20, 1912, nor did it file any proof of debt against T. W. Kirkbride, Incorporated, in the bankruptcy court until February 26, 1913, when it filed a petition in the bankruptcy proceeding, setting up its claim to the fund, and asking that such petition be treated, if necessary, as a proof of debt. The trustee and certain creditors objected, and the referee, after hearing, dismissed the petition, holding that the appellee had no valid claim to or interest in the fund in question.

Upon appeal to the District Court the order of the referee was reversed and the trustee in bankruptcy directed to pay to the appellee the fund in controversy. From that decree the trustee and creditors appeal to this court. No opinion was written by the learned District Judge, and we are therefore not advised of the grounds upon which he based his decision.

[1] The case thus presented turns upon the construction of section 2479 of the Code of Virginia, which reads as follows:

"Any subcontractor may give notice in writing to the owner or his agent, stating the nature and character of his contract, and the probable amount of his claim, and if such subcontractor shall at any time after the work done or material furnished by him and before the expiration of thirty days from the time such building or structure is completed, or the work thereon otherwise terminated, furnish the owner thereof, or his agent and also the general contractor with a correct account, verified by affidavit, of his claim against the general contractor for the work done or materials furnished and of the amount due, the owner shall be personally liable to the claimant for the amount due to said contractor by said general contractor: Provided, that the said amount does not exceed the sum in which the owner is indebted to the general contractor at the time the notice is given or may thereafter become indebted by virtue of his contract with said general contractor."

Upon the facts above stated regarding the Virginia Company and its relations to the Norfolk & Western Railway Company, we have no hesitation in holding that the railway company is the owner of the building in question, within the meaning of that term as used in the section quoted. In every substantial respect and for every practical purpose, this property is the possession of the railway company, and that company must be deemed the owner thereof, under the circumstances of this case and for the purposes of this statute, although the naked title is held by another corporation which the railway company has organized to serve its own convenience. The Virginia Company is merely an instrumentality which the railway company uses for a special purpose; and for that purpose it is in effect the railway company itself under another name.

Moreover, as it seems to us, the contrary view misconceives the real intent of the statute here considered. That statute was not designed

to give the subcontractor a lien upon the land, but to enable him to charge with personal liability the party with whom the general contractor has agreed to erect a building and by whom the contract price is agreed to be paid. The notice to be served operates to arrest further payment to the general contractor and lays the foundation for enforcing the claim of the subcontractor against the person who has promised to pay for the structure in process of erection. The recipient of the notice is thereby apprised that the subcontractor serving the same is performing work upon or furnishing materials for the building under construction; and the required statement of the probable amount of the claim measures the sum for which he may become personally liable and which he may therefore withhold from the moneys due or to become due to the general contractor. The statute assumes that there is a construction agreement, under which moneys will be payable to the general contractor, and it gives to the subcontractor complying with its provisions a preferred claim against this fund, with the right of action to recover the same. This authorized suit is not based upon the title to the land, but upon the agreement to pay for constructing the building. The obligation entered into with the general contractor is the foundation of the subcontractor's right of action, and that right of action is independent of the ownership of the land on which the structure is erected. Indeed, as we see the matter, the question of who holds the paper title to the property is quite immaterial, since the person who has undertaken to pay for the building is the person who may be made liable under this section of the Virginia Code. Without amplifying the argument, we hold that the notice of the appellee in this case was properly served on the railway company, and that its claim to the fund in question cannot be defeated by the circumstance that no notice was served on the Virginia Company, which happened to hold the legal title.

[2] The real question to be decided is whether the appellee has brought itself within the provisions of section 2479; that is, to come to the ultimate inquiry, whether the notice of January 4, 1911, was served in time. This requirement of the section has been construed quite recently by the Supreme Court of Appeals of Virginia in Steigleder v. Allen, 113 Va. 686, 75 S. E. 191, in which the point was directly involved, and it was distinctly held that it is too late to serve the notice after the work has been performed or the materials furnished by the subcontractor. In that case, after commenting upon the provision that the subcontractor shall give notice to the owner of the "nature and character of his contract and the probable amount of his claim," the court, among other things, says:

"The language of the statute unmistakably indicates that the notice must be given before the actual amount of the claim is ascertained, before the material is furnished or the work completed, to apprise the owner of the nature of the contract under which the subcontractor will have a debt due to him, while the requirement that the subcontractor shall, within a prescribed period, serve the owner and general contractor with a verified account, etc., was intended to have the owner informed as to the actual amount of the subcontractor's claim against the general contractor. The right of the subcontractor to recover of the owner, personally, in such a case, like the right of such a contractor to enforce a mechanic's lien against the owner's property, is purely the creation of the statute, and it must be availed of, if at all, upon

the terms and conditions which the statute prescribes. Section 2479 of the Code prescribed in express, plain, and unmistakable language the way, and the only way, in which an owner of property can be bound personally to a subcontractor for a debt due him from the general contractor, with whom the owner alone contracted for improvements upon his property."

In accordance with a familiar rule we are bound to accept this construction of the statute by the highest court of the state, and it must therefore be held that the subcontractor cannot avail himself of the benefits of this section unless he serves his notice prior to or during the performance of his contract and before its completion. The theory of the statute seems to be that the subcontractor may extend credit to the general contractor in reliance upon the protection secured by giving notice to the owner of the nature of his contract and the probable amount of his claim; and this clearly implies that the notice cannot be deferred until after his contract has been performed.

[3] It is to be noted in the Virginia case just cited that Steigleder, the subcontractor, had made an express contract with Walton, the general contractor, to do the entire cement and concrete work in the house in question, which was the subject of the general contract between Walton and the owner, for a sum fixed by the terms of his subcontract, and that the notice to the owner was not served until after the completion of such subcontract. And this brings us to consider whether the case at bar differs in any substantial respect from the Virginia case which construed section 2479, as above stated. In the first place, it is much to be doubted whether the appellee was a subcontractor, as that term is commonly understood, or had any contract at all with T. W. Kirkbride, Incorporated, the general contractor. There is no evidence that the relation of contractor and subcontractor ever existed between them, except the fact that appellee furnished a quantity of materials to the general contractor, and such inferences as may be drawn from the verified account served on the railway company. We have carefully searched the record without finding the slightest proof of a contract under which these materials were supplied, much less a contract which was subsisting and uncompleted when the appellee notified the owner that it claimed the benefit of section 2479. Taylor Gleaves, the manager of appellee, was a witness before the referee in bankruptcy, but he gave no testimony which tends in the least to show that an agreement to furnish materials for the building at Crewe had ever been made with the Kirkbride concern. Indeed, no attempt was made in any way to prove the existence of a contract entered into at any time, or for any definite quantity of materials. It is merely repeating to say that the only evidence of a contract is the fact that materials for this building were procured from the appellee, and the inferences permissible from the form and contents of the account afterwards rendered.

Inspection of this account shows that it begins with a debit, under date of May 6, 1910, of enumerated articles, such as would be used in the construction of a building, for which there is a lump charge of $3,963.40, or nearly two-thirds of the total amount furnished. It may be possible to infer from this entry that these materials were furnished in pursuance of an estimate and for an agreed price of the aggregate stated. There is, however, no reference to any contract and no sug-

gestion of an agreement for further supplies. The balance of the account consists of items and amounts charged on various subsequent dates; the last date prior to the assignment of the contractor being November 7, 1911, when charges were made to the amount of $151.33. There is nothing in the form or contents of this account which permits the inference of a continuing contract for the articles furnished after the date of the first entry. It is nothing more than an ordinary running account between a dealer and his customer. For ought that appears, the contractor was under no obligation, after the first purchase, to keep on buying from the appellee, and we think it should be presumed, in the absence of proof, that it was free to purchase elsewhere. If, as we suppose, there is a clear distinction between a subcontractor and a materialman, we are unable to see that the appellee was anything more than a materialman, at least as to the purchases following the first. There was buying and selling from time to time, but each instance was a separate transaction, so far as is shown, which had no connection with subsequent dealings. In short, there is nothing to indicate that the relations of contractor and subcontractor, if they ever existed, were continued during the period when the later purchases were made.

[4] Even if it should be held otherwise as to the transactions just considered, it seems clear to us that any contract relations which may have previously existed were terminated by the assignment of the contractor. No obligation to procure further materials from appellee passed to the assignee, and no purchases were in fact made by him during the short time he continued the work. When the railway company took possession of the property, the contract with T. W. Kirkbride, Incorporated, was in effect annulled. Plainly the railway company incurred no obligation to deal with appellee, but was free to get materials for the completion of the building wherever it chose. The circumstance that it did buy a small amount from the appellee is of no legal significance, and could not have the effect of giving to appellee rights not otherwise possessed to recover its debt under the provisions of section 2479. It is evident that appellee charged these materials to the contractor and declined to receive pay therefor from the railway company for the sole purpose of claiming that there was a continuing contract which was uncompleted when its notice was served on the railway company. But we are convinced that these sales to the owner of the property cannot be tied up with the prior sales to the contractor, even if the latter had any binding connection with each other, and that the appellee, when it served its notice on the railway company, had lost its right to reach the unpaid balance of the contract price by proceedings under the section in question. In a word, we perceive no sustainable principle which distinguishes this case from the Steigleder Case decided by the Virginia court of last resort.

The claim is advanced that it was admitted that appellee had a contract to furnish materials for the building in question, but this claim is not sustained by anything found in the record. It is true that the notice served on the railway company alleges that these materials were furnished "under contract," though the nature of the contract and the kind of materials are not shown, and this allegation is repeat-

ed in appellee's action at law against the railway company, in its answer in the equity suit and in the petition filed in this proceeding. But nothing appears to indicate that the asserted admission has ever been made by the appellants or even by the railway company. No answer was made to the petition in the bankruptcy proceeding, and the referee seems to have heard the matter on the petition itself. Under such circumstances, it was plainly incumbent upon the appellee to establish the facts necessary to maintain its contention.

The point is also made, if we understand the brief of appellee's counsel, that the assignments of error do not bring up the question of notice which we have discussed, but we are satisfied that this question is sufficiently raised by the third assignment, and the objection is therefore without substantial merit.

It goes without saying that the trustee in bankruptcy received the fund in question subject to the rights and equities of appellee the same as though it had remained in the hands of the railway company. For the purpose of reaching this fund under section 2479, the petition of appellee was seasonably filed, but, as a proof of debt against the bankrupt's estate, we are of opinion that it was properly rejected by the referee because not filed within the time required by the Bankruptcy Act. We are also of opinion, for the reasons above stated, that the referee was right in dismissing the petition because the appellee is not entitled to the fund; and it follows that the decree appealed from should be reversed, and the case remanded for further proceedings not inconsistent with this opinion.

Reversed.